### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| HERMAN J. THIELE, II, | ) | CASE NO. 1:16CV00942 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Herman J. Thiele, II ("Plaintiff" or "Thiele"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

In June 2012, Thiele filed applications for POD and DIB alleging a disability onset date

of January 17, 2012 and claiming he was disabled due to chronic obstructive pulmonary disease

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

("COPD"), arthritis, hearing loss, tinnitus, nerve pain, high blood pressure, cholesterol, hip and

back pain, depression and post-traumatic stress disorder ("PTSD").  (Transcript ("Tr.") 12, 139,

160.)  The applications were denied initially and upon reconsideration, and Thiele requested a

hearing before an administrative law judge ("ALJ").  (Tr. 12.)

On October 29, 2014, an ALJ held a hearing, during which Thiele, represented by

counsel, and an impartial vocational expert ("VE") testified.  (Tr. 27-64.)  On December 2, 2014,

the ALJ issued a written decision finding Thiele was not disabled.  (Tr. 12-26.)  The ALJ' s

decision became final on February 25, 2016, when the Appeals Council declined further review.

(Tr. 1-3.)

On April 20, 2016, Thiele filed his complaint to challenge the Commissioner's final

decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 19, 21.)

Thiele asserts the following assignment of error:

> (1)     The Administrative Law Judge erred at Steps Two and Five of the
> Sequential Evaluation in concluding that Plaintiff is capable of performing
> light [sic] work activity.

(Doc. No. 19.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Thiele was born in December 1953 and was sixty (60) years-old at the time of his

administrative hearing, making him a "person of advanced age" under social security

regulations.  (Tr. 21, 139.)  *See* 20 C.F.R. §§ 404.1563(e) & 416.963(e).  He has a high school

education and is able to communicate in English.  (Tr. 21.)  He has past relevant work as a

cement mixer/driver, front-end loader operator, and a block maker.  (*Id.*)

2

**B.      Relevant Medical Evidence**

**1.        Mental Impairments**

On June 28, 2011, Thiele presented to clinical nurse specialist Patricia Adragna and clinical social worker Charles Defibaugh, LISW-S, for evaluation and treatment of PTSD symptoms.  (Tr. 459-467.)  Thiele stated he was a Vietnam Combat Navy veteran with a history of PTSD "that went into remission, about 10 years ago, except [for] his issues regarding authority and females."  (Tr. 460.)  He reported experiencing recurring nightmares for the past twenty years relating to a traumatic event that occurred during his service in Vietnam.  (*Id*.)  He also complained of  flashbacks.  (Tr. 462, 467.)  Thiele rated his depression and anxiety an 8 on a scale of 10.  (Tr. 461.)

On examination, Ms. Ardagna found Thiele's speech, concentration, and memory were good, and his energy was moderate.  (Tr. 460-461.)  She also noted Thiele had a blunted affect, with average insight and good judgment.  (*Id*.)  Thiele was diagnosed with (1) PTSD, severe in remission, moderate currently; and (2) polysubstance abuse in remission.[2]  (Tr. 461-463.)  He was prescribed Zoloft 25 mg and advised to return for regular counseling sessions to address his irritability and "outbursts of anger."  (Tr. 463, 466.)

On August 9, 2011, Thiele presented to psychiatrist Steven Miller, M.D., and reported improvement with Zoloft but confusion about the correct dosage.  (Tr. 450-452.)  Thiele denied flashbacks or nightmares.  (Tr. 451.)  On examination, Thiele was alert, oriented, polite, and

_____

[2] Ms. Ardagna's treatment notes indicates Thiele was assessed a Global Assessment of Functioning ("GAF") of 65, indicating mild symptoms. However, it is somewhat unclear from the treatment notes whether this GAF was assigned by Ms. Ardagna in June 2011, or if this was a previous GAF score that was assessed by a different practitioner in 2009. (Tr. 463.)

3

cooperative, with good eye contact and no cognitive deficits.  (*Id.*)  Dr. Miller also noted a fair,

appropriate and pleasant affect; logical and coherent speech; and good mood, insight, and

judgment.  (*Id.*)  He diagnosed PTSD and substance abuse-remission, and assessed a GAF[3] of 55,

indicating moderate symptoms.  (*Id.*)  In a treatment session with Mr. Defibaugh that same day,

Thiele stated his "anger is pretty well managed at this point in time; medication is helpful though

he's not taking meds quite as prescribed."  (Tr. 452.)

On September 19, 2011, Thiele reported his depression and anxiety had improved from

an 8 to a 5 on a scale of 10.  (Tr. 439.)  He stated he had "cut back on his anti-depressant due to

it making him so 'groggy,'" and indicated he was now taking 6.25 mg of Zoloft daily, or 1/4 of

his previous dosage.  (Tr. 440,442.)  Thiele continued to complain of having flashbacks to

Vietnam, stating "during this time he can actually 'see [him]self there.'"  (Tr. 442.)  On

examination, Mr. Defibaugh noted Thiele was friendly and cooperative, with a broader affect

and intermittent eye contact.  (*Id.*)

In November 2011, Thiele presented to Mr. Defibaugh and indicated it was "difficult to

concentrate and his mind wanders constantly."  (Tr. 424.)  He also related two incidents "in

which anger was an issue," but felt "during both he did reasonably well."  (*Id.*)  Thiele reported

he was "med compliant" and stated his "symptomology is secondary due to stress over health

---

[3] The GAF scale reports a clinician's assessment of an individual's overall level
of functioning.  An individual's GAF is rated between 0-100, with lower numbers
indicating more severe mental impairments.  A GAF score between 51 and 60 indicates
moderate symptoms or moderate difficulty in social, occupational, or school functioning.
A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of
clarity . . . and questionable  psychometrics in routine practice."  *See Diagnostic and
Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th
ed., 2013).

issues and the fact those are preventing him from working."  (*Id*.)

On April 20, 2012, Thiele returned to Mr. Defibaugh and complained Zoloft "does not work as well as he hoped; it just makes him tired and yawn a lot."  (Tr. 366.)  He also stated "stress/anxiety is an issue as well."  (*Id*.)  That same day, Thiele began treatment with psychiatrist Antonia Fitzgerald, M.D.  (Tr. 361-365.)  He reported "his mood has been somewhat more depressed," and "anxiety high/related to daily demands."  (Tr. 362.)  On examination, Dr. Fitzgerald noted a "mildly depressed" mood and blunted affect.  (*Id*.)  She diagnosed PTSD, severe in remission, moderate currently; and polysubstance abuse in remission.  (Tr. 363.)  Dr. Fitzgerald assessed a GAF of 60 and increased Thiele's Zoloft dosage to 50 mg.  (*Id*.)  The following month, Thiele called and reported he was not able to take the Zoloft because it caused excessive fatigue.  (Tr. 344.)

Thiele returned to Dr. Fitzgerald on August 1, 2012, who had apparently switched his medication to Wellbutrin.  (Tr. 550-551.)  Thiele reported an improved mood and denied psychiatric symptoms; however, he continued to report anxiety.  (Tr. 550.)  On examination, Thiele's mood was mildly depressed and his affect was blunted.  (*Id*.)  Dr. Fitzgerald found average insight and good judgment, and assessed a GAF of 60.  (Tr. 550-551.)  She advised him to continue taking Wellbutrin, and to follow up with Mr. Defibaugh for supportive therapy once per month.  (*Id*.)

On December 3, 2012, Thiele presented to Mr. Defibaugh.  (Tr. 540-544.)  He stated he was experiencing "periodic PTSD symptoms," including "irritability when encountering rude people."  (Tr. 542.)  Mr. Defibaugh also noted Thiele "chose not to take the psychiatric med prescribed to him; is taking herbals which he feels he's adequately researched.  States they work

better and more often than not 'I wake up with a smile on my face.'"  (*Id*.)  Thiele also indicated he is "choosing to live a value driven life at this point in time."  (Tr. 544.)

On July 16, 2013, Thiele returned to Dr. Fitzgerald.  (Tr. 607-609.)  He reported he had stopped taking Wellbutrin and was instead taking "Kira," which Dr. Fitzgerald described as a brand name for St. John's Wort.  (Tr. 607.)  Thiele stated his mood was good and denied psychiatric symptoms, but continued to complain of anxiety related to daily tasks.  (*Id*.)  Examination revealed a mildly depressed mood, blunted affect, average insight, and good judgment.  (Tr. 608.)

Thiele also presented to Mr. Defibaugh on that same date.  (Tr. 612.)  He reported his PTSD symptoms persisted, including "reexperiencing and arousal symptoms."  (*Id*.)  Thiele also "processed thoughts and feelings regarding the excessive length of time it's taking for [the Veterans Administration Regional Office] and [Social Security] to act on his claims."  (*Id*.)  Thiele indicated he was "hoping to take a cross country trip once his income stabilizes; he wants to fish for salmon in Alaska."  (*Id*.)

On March 17, 2014, Thiele returned to Dr. Fitzgerald, stating his mood was good.  (Tr. 571.)  He continued to refuse psychiatric medication and denied psychiatric symptoms with the exception of anxiety.  (*Id*.)  Dr. Fitzgerald again diagnosed PTSD, severe in remission, moderate currently, and polysubstance abuse in remission; and assessed a GAF of 60.  (Tr. 572.)  On that same date, Thiele presented to Mr. Defibaugh.  (Tr. 574.)  He stated "irritability is still an issue," but he "feels part of the issue may be related by the fact his hearing is deficient."  (*Id*.)  Thiele also reported experiencing nightmares lately, after he which he "awakens in a sweat, heart racing and the same feelings he had after returning from military service up to 20 years before they

ceased." (Tr. 574-575.)

### 2. Physical Impairments

In June 2009, Thiele was injured while working as a concrete mixer truck driver. (Tr. 234.) He was on the ladder of the truck, and reached down with his left hand to grab a five gallon bucket filled with liquid from the bumper. (*Id*.) As he reached down and started to lift the bucket, he "developed severe pain in the groin, ribs and back." (*Id*.) The parties do not direct this Court's attention to any medical records relating to any treatment he may have received at the time of this injury or in the several years following it.

On December 27, 2011, Thiele presented to nurse practitioner Byschelle Jesberger for treatment of chronic cough and wheezing. (Tr. 293-300.) Thiele reported he was "on 4 different inhalers, none of which really help him much." (Tr. 293.) He complained of shortness of breath and coughing spells, one of which was so severe he "almost passed out." (*Id*.) Thiele also reported a history of severe sinus infections. (*Id*.) On examination, Thiele was not in acute distress, but Ms. Jesberger did note diffuse expiratory wheezing. (Tr. 296.) In addition, treatment records from this visit include pulmonary function test results from May 2010, which showed moderate obstructive ventilatory impairment. (Tr. 298-299.)

Ms. Jerberger noted Thiele was scheduled for surgery the following week; i.e., Functional Endoscopic Sinus Surgery ("FESS") and septoplasty. (Tr. 300.) She stated "given the extent of sinusitis, [she] would expect him to feel less shortness of breath/cough after surgery, however his job is very physically demanding and exposes him to many different chemicals, so long term he may not be able to do this type of work." (*Id*.)

It appears Thiele underwent sinus surgery in January 2012. (Tr. 302, 577.) Pulmonary

7

Function testing from February 2012 continued to suggest a moderate obstructive ventilatory impairment.  (Tr. 302-303.)

Meanwhile, Thiele presented to chiropractor Timothy Hiner, D.C., between December 2011 and March 2012 for treatment of his back, hip, and groin pain.  (Tr.  238-240.)  On February 14, 2012, Dr. Hiner wrote a letter indicating Thiele suffered from rib, back, and groin strain and stated "treatment is medically necessary at this time because the patient is still suffering from pain in these areas."  (Tr. 236.)  Dr. Hiner also noted Thiele "has been under no treatment for these injuries so it impossible to determine to what degree these conditions would be permanent but is sufficient to say that the injury can still be bothering him."  (*Id*.)

In March 2012, Thiele underwent an examination with Bureau of Workers Compensation ("BWC") disability evaluator Matthew Gajkowski, D.C.   (Tr. 234-235.)  Thiele complained of back, rib, and groin pain, which he rated a 7 on a scale of 10.  (*Id*.)  He stated the pain was gradually worsening and prevented him from sitting for more than ½ hour.  (*Id*.)  On examination, Dr. Gajkowski noted positive straight leg raise bilaterally; positive Braggard's with sacroiliac area pain bilaterally; bilateral +2 patellar reflexes; normal Babinski's; positive Yeoman's bilaterally the left greater than the right; and positive Hibb's bilaterally.  (*Id.*)

On April 9, 2012, Thiele presented to the emergency department with complaints of severe "left leg pain inner aspect of left knee with shooting pains up from knees x 5 weeks."  (Tr. 244-247.)  An Ace wrap was applied to his left knee and he was discharged.  (Tr. 245.)

Later that month, Thiele presented to nurse practitioner Mandeep Saran for follow-up regarding his chronic sinusitis, hypertension, hypercholesterolemia, and COPD.  (Tr. 354-360.) He reported he was "very happy about his sinuses" and "doing well" post-surgery.  (Tr. 357.)

8

With regard to his COPD, Thiele stated he was using Combivent six to eight times per day, as well as albuterol as needed.  (*Id*.)  He complained of generalized joint pains, including in his knees, hands, wrist, and elbows.  (Tr. 358.)  Thiele reported his right knee was worse than his left, especially when getting in and out of his truck.  (*Id*.)  On examination, Mr. Saran noted a "few wheezes," some pain with internal rotation and extension in Thiele's knee, and no edema in his feet.  (Tr. 358.)

On April 23, 2012, Thiele presented to Ms. Jesberger for follow up regarding his COPD.  (Tr. 348-353.)  He reported "a couple instances of heavy coughing to the point where he felt like passing out, but this has become much less frequent since he had the sinus surgery."  (Tr. 348.)  Ms. Jesberger assessed "COPD, GOLD Stage 2."  (Tr. 353.)  She found a mild exacerbation but no clear signs of infection, and prescribed a short course of prednisone.  (*Id*.)  Ms. Jesberger also advised Thiele to increase his Symbicort to twice daily, continue Spiriva once daily, and use Albuterol as needed.  (*Id.*)

On May 1, 2012, Thiele presented for a physical therapy consult for left knee and low back/hip pain.  (Tr. 285-286.)  He reported pain when performing sit to stand transfers, ambulation, and "sometimes when sitting;" but no instability or locking with the knee.  (*Id*.)  Thiele also complained of ongoing low back and hip pain stemming from his 2009 injury, as well as groin pain two to three times per month.  (*Id*.)  He reported experiencing "a separation of his ribs."  (*Id*.)  Examination revealed (1) a forward head and rounded shoulder position; (2) increased anterior pelvic rotation with an increase in lumbar lordosis; (3) bilateral pes planus (flat feet) slight left Tredelenburg; (4) normal range of motion for the lumbar spine and bilateral lower extremities with the extension of left knee extension; (5) bilateral lower extremity muscle

9

strength of 4+/5; (6) minimal tenderness to palpation over the medial joint line of the left knee; and (7) positive patellofemoral compression test of the left knee.  (*Id.*)  Physical therapist Christopher Wood ordered x-rays of Thiele's low back and knee, and advised him to use a knee brace and power step orthotics.  (*Id.*)

Thiele underwent x-rays of his left knee and lumbar spine on May 7, 2012.  (Tr. 255-257.)  The knee x-ray was unremarkable.  (Tr. 255.)  The x-rays of Thiele's lumbar spine showed degenerative changes, including narrowing of all of the lumbar disc spaces with endplate spurring and sclerosis.  (Tr. 256.)

That same day, Thiele presented to physical therapy assistant Debra Benjamin.  (Tr. 345-347.)  He reported improvement in his knee pain with the brace and orthotics, and rated his pain a 2 on a scale of 10.  (*Id.*)  Ms. Benjamin noted Thiele was able to perform physical therapy exercises without complaint, and advised him to return for three additional visits "for global strengthening of the bilateral hips and left knee."  (*Id.*)

On August 8, 2012, Dr. Hiner completed a questionnaire regarding Thiele's physical impairments.  (Tr. 506.)  He stated Thiele's low back and hip pain made it "difficult [for him] to stand, walk, or sit," and found Thiele's lumbar range of motion was limited in both flexion and extension.  (*Id.*)  Dr. Hiner stated Thiele favored his left hip and leg and occasionally used a cane.  (*Id.*)  He noted the findings had persisted for the past three years despite therapy, and "treatment felt good" but Thiele's pain had never been eliminated.  (*Id.*)

Several months later, on December 3, 2012, Thiele presented to nurse practitioner Michelle Clapham for follow up regarding his various physical impairments.  (Tr. 650-654.)  He reported falling three months previously while cutting a branch out of a tree with a chain saw.

10

(Tr. 651)  Thiele reported pain across his low back and ribs, as well as a bruised and swollen right leg from knee to heel.  (*Id.*)  With regard to his chronic sinusitis, Thiele stated his sinuses were "doing very well" and he rarely needed to use his Flonase or sinus rinse.  (*Id.*)  As for his COPD, Thiele reported "no issues– stable."  (*Id.*)  He reported no cough, dyspnea, or weakness. (*Id.*)

On examination, Ms. Clapham noted steady gait, no focal deficits, and full muscle strength in Thiele's bilateral upper and lower extremities.  (Tr. 652.)  Thiele "appeared comfortable" and was in no apparent distress, but Ms. Clapham did note mild tenderness to palpation of Thiele's lumbar area.  (*Id.*)  With regard to Thiele's lungs, Ms. Clapham noted no wheezes, rhonchi or rales.  (*Id.*)  She observed no clubbing or edema in Thiele's extremities with the exception of an area of edema 6 cm in diameter above Thiele's right ankle.  (*Id.*)  Ms. Clapham ordered x-rays of Thiele's right foot, ankle, tibia and fibula, and lumbosacral spine. (*Id.*)

Thiele underwent the above x-rays on December 7, 2012.  (Tr. 509-515.)  Thiele's right foot x-ray showed mild hallux valgus deformity of his great toe.  (Tr. 510.)  The x-rays of his right ankle, tibia, and fibula were normal.  (Tr. 510-512)  The x-ray of Thiele's lumbar spine revealed slight scoliosis and degenerative changes including disc space narrowing with spurring at all lumbar levels, and facet hypertrophy at L4 and L5.  (Tr. 512-513.)

Meanwhile, on December 5, 2012, Thiele returned to Ms. Jesberger for follow up regarding his COPD.  (Tr. 631-637.)  He reported he had retired the previous January and felt better "away from the chemicals."  (Tr. 631.)  Thiele stated he had not refilled his Symbicort since April because he "hasn't been needing/using it."  (*Id.*)  He also reported using his

11

Albuterol less than daily, and indicated his sinuses were "much improved."  (*Id*.)  On examination, Thiele was in no acute distress and his lungs were clear.  (Tr. 634.)  Ms. Jesberger assessed "COPD, GOLD Stage 2, now with greatly improved symptoms since he retired and is away from heavy exertion and the chemicals that were irritating him."  (Tr. 636-637.)  She advised him to return for follow up in a year, or sooner if needed.  (Tr. 637.)

Thiele returned to Ms. Clapham on June 20, 2013.  (Tr. 616-621.)  He complained of fatigue, shortness of breath, paraesthesia of his left fingers secondary to a fracture of his left forearm in 1977, and chronic back pain exacerbated with increased activity.  (Tr. 617.)  Thiele stated his paraesthesia interfered with his fine motor movement.  (*Id*.)  He also indicated he was unable to lift more than 10 pounds due to his back pain, and unable to walk more than 75 feet without experiencing shortness of breath.  (Tr. 617-618.)

On examination, Ms. Clapham noted steady gait, no edema, bilateral upper and lower extremity muscle strength of 4/5, and peripheral pulses 1+ bilaterally.  (Tr. 619.)  She also noted diminished lung capacity but no wheezes, rhonchi, or rales.  (*Id*.)  Thiele declined a referral to orthopedics regarding his left hand fingers paraesthesia, stating it did not interfere with his day to day activities.  (Tr. 620.)  With regard to his chronic low back pain, Ms. Clapham advised Thiele to continue Tylenol/ibuprofen as needed.  (*Id*.)

On that same date, Ms. Clapham completed a questionnaire regarding Thiele's Physical Residual Functional Capacity.  (Tr. 561–562.)  She opined Thiele could lift and carry no more than 10 pounds, either occasionally or frequently; stand/walk for less than 2 hours in an 8 hour workday; and sit for "about 2 hours" in an 8 hour workday.  (*Id*.)  Ms. Clapham stated Thiele would need the opportunity to shift positions from sitting or standing/walking to relieve

12

discomfort every 15 minutes, and could stand for no more than 5 minutes before changing positions.  (*Id*.)  She also found he would need to lie down at unpredictable intervals during a work shift "secondary to fatigue from COPD."  (*Id*.)  Ms. Clapham determined Thiele could frequently handle (i.e. engage in gross manipulation), occasionally reach, and less than occasionally finger, feel, and push/pull.  (*Id*.)  As support for this opinion, Ms. Clapham cited Thiele's COPD, and the loss of feeling in the fingers of his left hand secondary to a compound fracture in his left forearm.  (*Id*.)  Finally, Ms. Clapham opined Thiele would be absent from work more than three times per month due to his impairments or treatment.  (*Id*.)

On November 21, 2013, Thiele returned to Ms. Clapham with complaints of hearing loss and blurred vision.  (Tr. 593-598.)  He also reported loss of feeling in the last quarter of his fingers on his left hand, and continued chronic low back pain.  (Tr. 596.)  Thiele denied fatigue, dyspnea, cough, weakness, muscle aches, or edema.  (*Id*.)  On examination, Ms. Clapham indicated no wheezes, rhonchi or rales.  (Tr. 597.)  She also noted steady gait, no edema, and peripheral pulses 2+ bilaterally.  (*Id*.)  With regard to Thiele's paraesthesia, low back pain, chronic sinusitis, and COPD, Ms. Clapham indicated no worsening of symptoms.  (Tr. 598.)  However, she referred Thiele to an audiologist for evaluation of chronic tinnitus and hearing changes.  (*Id*.)

On January 29, 2014, Thiele returned to Ms. Jesberger for follow up regarding his COPD.  (Tr. 582-583.)  He stated "overall he's been doing well from a pulmonary perspective." (*Id*.)  On examination, Ms. Jesberger noted Thiele's lungs were clear and he showed "good air entry."  (*Id*.)  She found as follows: "Symptomatically at baseline for the most part, feels like he might be a little more short of breath with the cold temperatures.  Has only been using Symbicort

once daily, and Spiriva somewhat sporadically." (*Id.*) Ms. Jesberger recommended he adhere to his medication regimen as prescribed "at least until he feels that he's returning to his baseline." (*Id.*)

On that same date, Thiele visited the audiology clinic reporting left sided hearing loss. (Tr. 580-581.) He complained of constant "crickets/air sounds," and reported three incidents of "true vertigo" that occurred when he got out of bed. (*Id.*) Thiele indicated he had been wearing a "left 2010 VA issued" hearing aid. (*Id.*) Audiometric testing revealed a "significant decrease in sensitivity" in his left ear. (*Id.*) Thiele was referred to the ENT clinic and fitted for a new hearing aid. (*Id.*)

On March 17, 2014, Thiele complained of "left side neck pain radiating into his left shoulder for the past couple of weeks." (Tr. 569.) He denied numbness in his extremities, but stated "it feels like an electrical charge (tingling) sensation occurring intermittently" in the left side of his neck. (*Id.*) He rated the discomfort a 3 on a scale of 10. (*Id.*) He denied headache, dizziness, weakness, or visual changes. (*Id.*) Thiele was advised to use heat, muscle rub to area, and Advil or Motrin as needed. (*Id.*)

The following day, Thiele underwent an x-ray of his cervical spine, which showed (1) moderately severe narrowing of the C6-C7 disc base with degenerative endplate change and degenerative spurring; and (2) minimal narrowing of the C5-C6 with minimal degenerative spondylotic change. (Tr. 659-660.) He was advised to use Ibuprofem 800 mg and ice/heat application. (Tr. 570.)

## C.     State Agency Reports

### 1.       Mental Impairments

14

On September 17, 2012, state agency physician Mary K. Hill, Ph.D., reviewed Thiele's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 71.)  Dr. Hill found Thiele had no limitations in his activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation.  (*Id.*)  She found Thiele's limitations due to psychiatric symptoms were not severe, stating he "performs [activities of daily living] independently, shops, manages finances, spends time socializing with others."  (*Id.*)

On April 4, 2013, state agency physician Karen Terry, Ph.D., also reviewed Thiele's medical records and completed a PRT.  (Tr. 85-86.)  Like Dr. Hill, Dr. Terry found Thiele had no limitations in his activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation.  (*Id.*)  She explained as follows:

> At recon[sideration], claimant reports being more depressed, angry and irritable since 12/12.  Reports his depression, anger and antisocial behavior prevent him from going most places.  Reports he is also forgetting things.
>
> Recent [activities of daily living] indicate the claimant's social functioning includes going out several times a month with lady friend, goes fishing about 1/month, talks to his children, etc.  His [activities of daily living] and [medical record] support the claimant not having a severe psych impairment at this time.

(Tr. 86.)

### 2.  **Physical Impairments**

On November 3, 2012, state agency physician Esberdado Villanueva, M.D., reviewed Thiele's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 72-74.)  He found Thiele could occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds; stand and/or walk for 6 hours in an 8 hour workday; and sit

15

for 6 hours in an 8 hour workday.  (*Id.*)  Dr. Villanueva further opined Thiele could never climb

ladders, ropes, or scaffolds, but had unlimited push/pull capacity and could frequently climb

ramps and stairs, balance, stoop, kneel, crouch, and crawl.  (*Id.*)  In support of these limitations,

Dr. Villanueva cited Thiele's degenerative disc disease and knee pain "with benign x-rays and

able to do the [physical therapy] requirement exercise."  (*Id.*)

Dr. Villanueva found Thiele had no manipulative or visual limitations, but had hearing

limitations in both ears.  (*Id.*)  He opined Thiele "can hear normal conversation but would have

difficulty hearing in noisy situations."  (*Id.*)  Finally, he found Thiele should avoid concentrated

exposure to extreme cold and heat, noise, fumes, odors, dusts, gases, poor ventilation, and

hazards (machinery, heights, etc.)  (*Id.*)

On March 11, 2013, state agency physician Olga Pylaeva, M.D., reviewed Thiele's

medical records and completed a Physical RFC Assessment.  (Tr. 87-89.)  She reached the same

conclusions as Dr. Villanueva.  (*Id.*)

**D.      Hearing Testimony**

During the October 2014 hearing, Thiele testified to the following:

- He earned a bachelor's degree in psychology and philosophy from Baldwin
  Wallace College in 1983.  (Tr. 37-38.)

- He last worked in December 2011 as a concrete mixer truck driver.  (Tr. 33.)  In
  that job, he regularly lifted 50 pounds as he went up and down a 10 foot ladder.
  (Tr. 34.)  Occasionally, he lifted as much as 100 pounds.  (Tr. 50-51.)  Prior to
  that, he made concrete blocks and drove a concrete block truck.  (Tr. 34.)  In all,
  he worked in concrete for 20 years.  (*Id.*)

- He left his job driving the concrete mixer because of breathing problems and
  flashbacks from his time in the military.  (Tr. 34.)  Additionally, in June 2011,
  he injured himself while carrying a five gallon jug up a ladder.  (Tr. 35, 51.)

- He lives with his son, daughter in law, and grandson.  (Tr. 35.)  He has a

16

girlfriend in Kentucky, whom he visits every three or four weeks for three or four days. (Tr. 36-37.) The drive is approximately five hours. (Tr. 37.) He is able to drive himself, but needs to pull over halfway there and rest for approximately 30 to 45 minutes. (*Id.*)

- He suffers from COPD. (Tr. 38-39.) His breathing problems were exacerbated by his job driving concrete mixer trucks; i.e., breathing in "the different aggregates and the dusts, and the chemicals, fly ash, cement, limestone dust." (Tr. 39.) Since he left his job in December 2011, his breathing problems have continued and gotten progressively worse. (Tr. 39-40.) He experiences night coughing, and sometimes has to take Albuterol once or twice during the night. (Tr. 40.) He also uses a nebulizer once every other month. (Tr. 51.) During the day, he experiences labored breathing and fatigue, particularly when walking. (Tr. 40.) Some days he can walk for only 10 minutes before having breathing problems, while on other days he can walk for up to 45 minutes. (Tr. 39.) He used to smoke, but quit 20 years ago. (Tr. 48.)

- His legs cramp up on a daily basis and his knees get sore. (Tr. 38, 40-41.) This began in June 2011 and the pain has gotten progressively worse. (Tr. 41.) When his legs cramp up, he has to lay down or straighten out his legs to alleviate the pain. (Tr. 41.) He has worn a brace on his left knee for the past two years, as well as compression stockings on his right ankle and calf. (Tr. 47.) He sometimes has difficulty getting up out his chair. (Tr. 47.)

- He suffers from tinnitus, which is "like a constant chirping in his left ear." (Tr. 43.) He uses a hearing aide. (*Id.*)

- He has a limited amount of motion in his left hand due to a compound fracture that he suffered in 1978 or 1979. (Tr. 46.) He experiences an aching sensation in his arm when he lifts up to 10 pounds. (Tr. 44-45.) He is left handed, but favors his right arm because of his problems with his left hand. (Tr. 47, 53.)

- He had neck pain and spasms earlier this year, resulting in pain that radiated into his shoulder. (Tr. 48.) He was told he had degenerative spinal disease. (*Id.*) He also suffers from low back pain. (Tr. 52.) Sometimes his back "collapses" while walking. (Tr. 47.)

- He can lift 10 pounds. (Tr. 44.) He has "no problems with sitting" except his back and legs get uncomfortable and he has to stretch. (Tr. 47-48.) He can walk for 10 to 45 minutes, depending on how he is feeling. (Tr. 39, 52.) He feels weaker because of the combination of his conditions. (Tr. 45.) He experiences pain in his lower extremities and lower back when he stands or walks for too long. (Tr. 52.)

17

- He has been diagnosed with PTSD and suffers from depression.  (Tr. 53, 56.)
  He experiences flashbacks and is easily irritated.  (Tr. 44.)  He had the same
  dream for 20 years after leaving the service but he started to see a psychologist
  and does not have the dreams anymore. (Tr. 44.) He does not like crowded
  places and does not feel comfortable around a lot of people.  (Tr. 55-56.)  He has
  tried medication, but stopped taking it because he does not like "his mind to be
  altered."  (Tr.  54-55.)  He takes an over the counter medication similar to St.
  John's Wort instead.  (Tr. 54.)

- During the day, he does "menial tasks" such as laundry, sweeping, and the
  dishes.  (Tr. 35.)  He goes grocery shopping once per week.  (Tr. 35-36.)  He
  likes to go fishing but has not done it for a year and a half because he has not
  had enough time.  (Tr. 36.)  He enjoys talking and going out to eat with friends.
  (*Id.*)

Prior to the hearing, the VE completed a form indicating that Thiele had past work as a

cement mixer driver (medium, semi-skilled, SVP 3); front-end loader operator (medium, semi-

skilled, SVP 3); and block maker (medium, semi-skilled, SVP 4).  (Tr. 224.)  At the hearing, the

VE added that these jobs "were performed up to the heavy, even very heavy level at times."  (Tr.

59.)  The ALJ then posed the following hypothetical question:

> All right.  My first hypothetical, if you could please assume an individual of the
> same age, education, and work experience as the claimant.  This individual would
> be able to work at the medium level.  He could occasionally push and pull with
> the left upper extremity.  He could never climb ladders, ropes, or scaffolds.  He
> could occasionally climb ramps or stairs.  He could frequently balance, stoop,
> kneel, crouch, and occasionally crawl.  He could frequently handle and finger
> objects with the left upper extremity.  He could have frequent exposure to
> extreme cold and extreme heat.  He could never be exposed to excessive noise but
> along those lines, he would be able to work in an area with moderate, moderate
> noise such as a restaurant or a call center. This individual could have occasional
> exposure to environment irritants such as fumes, odors, dusts, and gases, and
> poorly ventilated areas.  He could never use moving machinery or be exposed to
> unprotected heights and could have occasional interaction with the public and
> superficial contact meaning no negotiation or confrontation with others.  Would
> such an individual be able to perform claimant's past work?

(Tr. 59.)

The VE testified the hypothetical individual would not be able to perform Thiele's past

18

work as a cement mixer driver, front-end loader operator, and block maker , but would be able to

perform other representative jobs in the economy, such as hand packager (medium, unskilled);

store laborer (medium, unskilled); and assembler (medium, unskilled).  (Tr. 60.)

> Thiele's counsel then asked the following hypothetical:
>
> And for the record, if we were to limit the claimant to light work with a[n] [at
> will] sit/stand option, no ladders, ropes, or scaffolds, only occasional stairs and
> ramps, occasional push/pull with the left upper extremity, no stooping, crouching,
> or crawling, occasional handling with the left upper extremity, no exposure to
> extreme temperatures or pulmonary irritants, no workplace hazards including
> dangerous machinery or heights, no contact with the general public and only
> superficial contact with coworkers and supervisors. . .  Could that hypothetical
> person perform the claimant's past work?

(Tr. 61.)  The VE testified such a hypothetical individual "could not do [Thiele's] past work and

there would be no work at the light level that would fit that hypothetical."  (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when

he became disabled; and (3) he filed while he was disabled or within twelve months of the date

the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way

of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v.*

*Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923

19

(6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Thiele was insured on his alleged disability onset date, January 17, 2012, and remained insured through June 30, 2017, his DLI. (Tr. 12.) Therefore, in order to be entitled to POD and DIB, Thiele must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

20

The ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through June 30, 2017.

2.     The claimant has not engaged in substantial gainful activity since January 17, 2012, the alleged onset date (20 CFR 404.1571 et seq.).

3.     The claimant has the following severe impairments: obesity, remote compound fracture in the left hand, hearing loss, degenerative disc disease and degenerative spondylotic changes, scoliosis, and chronic obstructive pulmonary disease ("COPD") (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment of combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he can occasionally push and pull with the left upper extremity. He can never climb ladders, ropes, or scaffolds. He can occasionally climb ramps or stairs. He can frequently balance, stoop, kneel, crouch, and occasionally crawl. The claimant can frequently handle and finger objects with the left hand. The claimant can have frequent exposure to extreme heat and cold. He can never have exposure to excessive noise, and can have moderate exposure to noise, such as in a restaurant or call center. The claimant can have occasional exposure to pulmonary irritants, such as fumes, dusts, gases, odors, and poor ventilation. He must avoid the use of moving machinery and unprotected heights.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on December ** 1953 and was 58 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant had at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material due to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the

claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.      The claimant has not been under a disability, as defined in the Social Security Act, from January 17, 2012, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 12-22.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner

22

are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

*Step Two Analysis*

In his first assignment of error, Thiele argues the ALJ erred in failing to find his PTSD a "severe" impairment at step two of the sequential evaluation, and "failing to include the limitations that said diagnosis imposes in his conclusions regarding the plaintiff's residual functional capacity." (Doc. No. 19.) Arguing the "record is replete with evidence of PTSD," Thiele argues the evidence "clearly supports the severity of Plaintiff's condition, in that it is more than a 'slight abnormality,' imposing more than a minimal effect on his ability to perform the mental requirements of work activity." (*Id*. at 7.)

The Commissioner asserts the ALJ reasonably determined Thiele's mental impairments were not severe because "his minimal treatment for them and improved condition proved that his PTSD symptoms were in remission." (Doc. No. 21 at 10.) She argues " a mere diagnosis does not indicate the severity of the impairment," and notes Thiele himself indicated his PTSD went into remission "about 10 years ago." (*Id*. at 11.) The Commissioner also maintains the ALJ's step two finding is supported by the fact that (1) Dr. Fitzgerald consistently assigned Thiele a GAF of 60 (indicating moderate symptoms); (2) Thiele discontinued his psychotropic medication in 2012 and reported improvement with a herbal supplement alone; and (3) both Drs. Hill and Terry opined Thiele's mental issues did not rise to the level of a severe impairment. (*Id*. at 11-13.)

24

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a) (40(ii) & 416.920(a)(4)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 416.920(c).  "An impairment ... is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a) & 416.921(a).[4]  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions such as standing, sitting, lifting, handling, etc.; (2) the ability to see, hear and speak; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b) & 416.921(b).

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims."  *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181 at *1 (July 2, 1996).  However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must

---

[4] In addition, pursuant to 20 C.F.R. § 404.1520a(a), "when [the Social Security Administration] evaluate[s] the severity of mental impairments for adults ... [it] must follow a special technique at each level in the administrative review process."   Thiele does not specifically argue that the ALJ erred because he failed to follow the "special technique" set forth in this regulation.

consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim."  *Id*.  "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do."  *Id*.

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at step two does "not constitute reversible error."  *Maziarz v. Sec'y of Health & Human Servs*., 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec*., 2009 WL 4981686 at * 2 (6th Cir. 2009).  The Sixth Circuit has observed that where a claimant clears the hurdle at step two (i.e. an ALJ finds that a claimant has established at least one severe impairment) and claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant."  *Anthony v. Astrue*, 2008 WL 508008 at * 5.

Here, at step two, the ALJ concluded Thiele's obesity, remote compound fracture in the left hand, hearing loss, degenerative disc disease and degenerative spondylotic changes, scoliosis, and COPD constituted "severe" impairments.  (Tr. 14.)  He then found Thiele's psychological impairments were not "severe," explaining as follows:

> The claimant has also alleged psychological impairments.  The treatment for these issues has been minimal.  He underwent counseling on a regular basis in

26

2011, prior to the alleged onset date (Exhibit 3F/157).  In 2012, the claimant only visited a mental health professional 3-4 times total.  He indicated some anger and irritability, but overall indicated that his PTSD symptoms had been in remission (Exhibit 3F/110, 111, 84).  He took Wellbutrin during this time, and his GAF score was a 60, indicating mild symptoms (Exhibit 3F/84, 5F/45).

By the end of 2012, the claimant had discontinued taking psychotropic medications all together.  He reported he was taking an herbal supplement, which made him feel better.  He indicated he was usually "waking up with a smile on his face."  (Exhibit 5F/36).

The claimant continued to not take any psychotropic medications in 2013 and 2014 (Exhibit 7F/45).  There are only records of 1-2 behavioral health visits each year (Exhibit 7F).  In July 2013, the claimant reported that he was planning on taking a cross-country trip and fishing in Alaska (Exhibit 7F/50). In March 2014, he reported he was still having some issues with irritability and dreams, but he continued to report a good mood and refused to take medications (Exhibits 7F/9, 12, 13).  While the claimant does have some psychological issues, it appears he is generally able to handle them with essentially no treatment.  He only visits a mental health professional a few times a year, and does not require any medication.  Moreover, he can perform a broad range of activities of daily living.

Mary K. Hill, Ph.D., a consultant with the State Disability Determination Services, opined that the claimant had no severe mental impairment (Exhibit 1A).  Karen Terry, Ph.D., another consultant, affirmed this opinion (Exhibit 3A).  I afford this opinion great weight, as it is consistent with the GAF scores, the minimal treatment, and the activities of daily living.

The claimant's medically determinable mental impairments of substance addiction disorder, anxiety disorder, post-traumatic stress disorder ("PTSD"), and depression, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.

(Tr. 14-15.)  The ALJ then considered the four broad functional areas set forth in the disability regulations for evaluating mental disorders.  (Tr. 15-16.)  He found no more than mild limitations, as follows:

The first functional area is activities of daily living.  In this area, the claimant has no limitation.  The claimant lives alone, and is able to take care of his own

27

needs.  He cleans and grocery shops.  He also drives to Kentucky every 3-4 weeks in order to visit his girlfriend.  This about a 5-hour trip, and he does this alone (testimony).  He has no trouble with personal care (Exhibit 8E/5).  He makes his own meals.  (Exhibit 8E/6).

The next functional area is social functioning.  In this area, the claimant has mild limitation.  The claimant has reported that he is easily irritated with others, and avoids crowds.  However, he is able to drive to Kentucky on his own every few weeks to visit his girlfriend (testimony).  He will go out to dinner and to the movies with this woman (Exhibit 8E/8).  He leaves his home several times a week, and will go out into public alone.  He shops in stores (Exhibit 8E/7).

The third functional area is concentration, persistence, or pace.  In this area, the claimant has mild limitation.  The claimant can manage his personal finances (Exhibit 8E/7).  He enjoys reading and watching television.  He goes fishing about once a month (Exhibit 8E/8).  He can follow both written and spoken instructions (Exhibit 8E/9).  He can handle changes in routine (Exhibit 8E/10).

The fourth functional area is episodes of decompensation.  In this area, the claimant has experienced no episodes of decompensation, which have been of extended duration.  There is no evidence that the claimant has experienced any episodes of decompensation.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere (20 CFR 404.1520a(d)(1)).

(Tr. 15-16.)

The Court finds substantial evidence supports the ALJ's conclusion that Thiele's PTSD is non-severe.  The record reflects Thiele presented for mental health treatment only a handful of times between his January 2012 onset date and the ALJ's December 2014 decision.  In 2012, Thiele presented to Dr. Fitzgerald and/or Mr. Defibaugh on three occasions, in April, August, and December 2012.  (Tr. 361-365, 550-551, 540-544.)  By his December 2012 visit, Thiele reported he had ceased taking Wellbutrin and was using "herbals" instead.  (Tr. 542.)  While he

reported "periodic PTSD" symptoms and some irritability, Thiele stated that "more often than not 'I wake up with a smile on my face.'" (*Id*.)  The record reflects he presented for mental health treatment on only one to two occasions in 2013 and one to two occasions in 2014.  (Tr. 607-609, 612, 571-575.)  At each of these visits, Thiele continued to refuse psychiatric medication and denied psychiatric symptoms with the exception of anxiety.  (*Id*.)

Moreover, during this time period, Thiele reported the ability to conduct a wide variety of daily activities, and regularly engage in social activities with family and friends.  In a Function Report dated March 19, 2013, Thiele indicated he lived alone and prepared his own meals, had "no problem with personal care," and performed house and yard work including laundry, sweeping, washing dishes, and mowing the lawn on a riding mower.  (Tr. 204-206.)  Thiele was able to shop in stores for food, clothing, and hygiene items, and manage his finances without assistance.  (Tr. 207.)  He read books and watched television daily; talked to his children once a week and visited them once or twice a month; saw "a lady" friend ten times a month for dinner/movies; and fished with a friend once a month.  (Tr. 208.)  Thiele described his ability to follow written and verbal instructions as "fine."  (Tr. 209.)  At the time of the October 2014 hearing, Thiele testified he lived with his son, daughter in law, and grandson, but still did his own grocery shopping, laundry, sweeping and dishes.  (Tr. 35-36.)  He reported talking and going out to eat with friends, and visiting his girlfriend in Kentucky once a month.  (Tr. 36-37.)  Additionally, while Thiele reported some flashbacks and irritability, he testified he no longer experienced nightmares.  (Tr. 44.)

Finally, as noted above, state agency physicians Dr. Hill and Dr. Terry both found Thiele's psychiatric symptoms were not severe, citing in particular his abilities to perform

activities of daily living and socialize with friends and family.  Significantly, Thiele does not direct this Court's attention to any medical opinion evidence indicating his PTSD is a severe impairment or results in mental limitations.  Accordingly, and based on the totality of the evidence discussed above, the Court finds substantial evidence supports the ALJ's step two determination that Thiele's PTSD was "non-severe."

The Court further finds that, even if the ALJ did err in finding Thiele's PTSD non-severe at step two, the ALJ's consideration of the cumulative effect of Thiele's impairments (both severe and non-severe) throughout the remaining steps of the analysis rendered any such error harmless.  *Maziarz*, 837 F.2d at 244.  The record reflects Thiele testified about his mental impairments (including his PTSD) during the October 2014 hearing.  (Tr. 44, 53-56.)  At step four, the ALJ indicated he had "considered all symptoms and the extent to which these symptoms can reasonably be expected as consistent with the objective medical evidence and other evidence."  (Tr. 17.)  At this step, the ALJ expressly acknowledged a statement submitted by Thiele's girlfriend that Thiele "is easily agitated with people and crowds (Exhibit 7E/7) and tends to avoid people," but afforded it little consideration on the grounds it was inconsistent with Thiele's "own reported activities of daily living, which are discussed above."  (Tr. 20.)  Although Thiele complains the ALJ failed to accommodate his mental impairments in the RFC, Thiele does not identify any specific mental limitations that he believes should have been included in the RFC.  Nor does he direct this Court's attention to any medical opinion evidence indicating his PTSD, in fact, results in any particular mental limitations.

Accordingly, and for all the reasons set forth above, Thiele's first assignment of error is without merit.

### RFC Assessment and Weighing of the Medical Opinion Evidence

In his second assignment of error, Thiele argues the ALJ erred in finding he was capable of performing a reduced range of medium work. He maintains the ALJ "failed to fairly and appropriately consider" the opinion of his "treating source," certified nurse practitioner Michelle Clapham. (Doc. No. 19 at 7.) Thiele then asserts the ALJ erred in according greater weight to the opinions of the state agency physicians Drs. Villaneuva and Pylaeva, arguing these physicians "merely reviewed an incomplete medical record and did not have the benefit of examining the plaintiff." (*Id*. at 9.) Finally, Thiele argues the ALJ "misinterprets or fails to fully consider [his] pulmonary impairment in his conclusions regarding the residual functional capacity." (*Id*. at 11.)

The Commissioner argues the ALJ reasonably determined Thiele could perform a reduced range of medium work. (Doc. No. 21 at 15.) She argues the ALJ properly rejected Ms. Clapham's opinion as being inconsistent with the medical evidence, including evidence that Thiele's pulmonary condition improved with medication and with time away from his former job as a concrete mixer. (*Id*. at 16.) The Commissioner also asserts the ALJ properly accorded great weight to the opinions of Drs. Villanueva and Pylaeva "because they were consistent with Plaintiff's x-rays, his minimal treatment course, his activities of daily living, and they accounted for his pulmonary sensitivity." (*Id*. at 18-19.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the

Commissioner." *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec*., 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, the ALJ thoroughly recounted the medical evidence regarding Thiele's physical impairments, including his degenerative disc disease and COPD.  (Tr. 17-20.)  The ALJ then addressed the opinion evidence, according "no weight" to the June 2013 opinion of Ms. Clapham and "great weight" to the opinions of state agency physicians Drs. Villanueva and Pylaeva.  (Tr. 20-21.) The ALJ formulated the following RFC:

>After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c)[5] except he can occasionally push and pull with the left upper extremity.  He can never climb ladders, ropes, or scaffolds.  He can occasionally climb ramps or stairs.  He can frequently balance, stoop, kneel, crouch, and occasionally crawl.  The claimant can frequently handle and finger objects with the left hand.  The claimant can have frequent exposure to extreme heat and cold.  He can never have exposure to excessive noise, and can have moderate exposure to noise, such as in a restaurant or call center.  The claimant can have occasional exposure to pulmonary irritants, such as fumes, dusts, gases, odors, and poor ventilation.  He must avoid the use of moving machinery and unprotected heights.

(Tr. 16.)

### Certified Nurse Practitioner Michelle Clapham

Thiele first argues the ALJ failed to properly analyze Ms. Clapham's June 2013 opinion regarding his physical functional capacity.  He asserts it was error for the ALJ to accord "no weight" to this opinion simply on the basis that Ms. Clapham is not an "acceptable medical source" under social security regulations.  Rather, Thiele claims Ms. Clapham's opinion "warranted further consideration" because she treated him over a considerable period of time and her opinion is consistent with the medical evidence, including x-rays of his lumbar and cervical spine showing degenerative disc disease.

Under Social Security regulations, only "acceptable medical sources" are considered "treating sources" whose opinions may be entitled to controlling weight.  *See* 20 CFR §§ 404.1502/416.902, 404.1513(d)/416.913(d), and 404.1527(d)/416.927(d); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 at * 2 (Aug. 9, 2006).  It is well-established that

---

[5] "Medium work" is defined as follows: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 CFR § 404.1567(c).

33

nurse practitioners, such as Ms. Clapham, are not "acceptable medical sources."  *See* 20 C.F.R.

§ 404.1513(a), (d).  *See also Noto v. Comm'r of Soc. Sec.*, 632 Fed. Appx. 243, 248 (6th Cir.

2015); *Racz v. Comm'r of Soc. Sec.*, 2016 WL 612536 at * 9 (S.D. Ohio Feb. 16, 2016); *Kostyo*

*v. Colvin*, 2015 WL 4067260 at * 5 (N.D. Ohio July 2, 2015); *Jones v. Comm'r of Soc. Sec.*,

2014 WL 861199 at * 2 (N.D. Ohio March 5, 2014).  Rather, a nurse practitioner is an "other

source" pursuant to 20 CFR §§ 404.1513(d)(1)/416.913(d)(1), which is neither entitled to

controlling weight or subject to the "good reasons" requirement of the treating physician rule.

*See* SSR 06-03p, 2006 WL 2329939 at * 2; *Hill v. Comm'r of Soc. Sec.*, 560 Fed. Appx. 547,

549 (6th Cir. 2014) (stating that although "[a]n ALJ must consider other-source opinions and

generally should explain the weight given to opinions for these 'other sources,' . . .  other-source

opinions are not entitled to any special deference."); *Racz*, 2016 WL 612536 at * 10 (noting that

opinion of non-acceptable medical source "while entitled to consideration, does not qualify as a

'medical opinion' as defined under 20 C.F.R. § 404.1527(a)(2), is not due any special

deference, is not entitled to controlling weight, cannot establish the existence of a medically

determinable impairment, and is not subject to the 'reason-giving' requirement under the treating

source rule.").

     Nonetheless, evidence from "other sources" should not be ignored.  As explained in

SSR 06-03p, information from "other sources" (such as nurse practitioners) is "important" and

"may provide insight into the severity of the impairment(s) and how it affects the individual's

ability to function." SSR 06-03P, 2006 WL 2329939 at * 2 -3 (Aug. 9, 2006).  Interpreting this

SSR, the Sixth Circuit has found that opinions from "other sources" who have seen the claimant

in their professional capacity "should be evaluated using the applicable factors, including how

34

long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc.* Sec., 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03P, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion"). *See also McKitrick v. Comm'r of Soc. Sec.*, 2011 WL 6939330 at * 12-13 (N.D. Ohio Dec. 30, 2011); *Kerlin v. Astrue,* 2010 WL 3937423 at * 7 (S.D. Ohio March 25, 2010).

Here, the ALJ considered Ms. Clapham's opinion as follows:

Michelle Clapham, CRNP, the claimant's nurse practitioner at the Veterans' Administration, filled out a form regarding the claimant's limitations. She opined that the claimant was limited to lifting and carrying less than 10 pounds, and could stand/walk less than two hours in an 8-hour workday. She opined he could sit about two hours in an 8-hour day, and would need to alternate between sitting and standing all day long. Ms. Clapham concluded that the claimant would need to lie down at times at unpredictable intervals during a work shift, secondary to his COPD symptoms. (Exhibit 6F/2). Ms. Clapham further found that the claimant could occasionally reach overhead, frequently handle, and less than occasionally finger, feel, push, and pull. She noted that the claimant would miss work more than three times a month (Exhibit 6F/3).

I afford this opinion no weight. Ms. Clapman [sic] is a nurse practitioner, and therefore, under the Regulations is not an acceptable medical source. Only acceptable medical sources may be considered a treating source whose medical opinion may be entitled to controlling weight (*See* 20 CFR 404.1527(a)(2), 416.927(a)(2), and SSR 96-2p). However, Social Security Ruling 06-03p does provide that I must evaluate an opinion from a non-acceptable medical source along with all the other evidence in the file. **Upon review of Ms. Clapman's [sic] opinion, her extreme conclusions in her opinion are not consistent [with] the conservative treatment course, the lack of any hospitalizations for his COPD, and the claimant's admission that his COPD was improved."**

(Tr. 20) (emphasis added).

The Court finds the ALJ properly evaluated Ms. Clapham's June 2013 opinion. First,

the Court rejects Thiele's argument that the ALJ rejected Ms. Clapham's opinion solely on the basis that she did not constitute an acceptable medical source. While the ALJ (correctly) recognized Ms. Clapham did not constitute an "acceptable medical source" under social security regulations, the ALJ expressly acknowledged the requirement that he nevertheless evaluate and consider her opinion pursuant to SSR 06-03p. The ALJ then did exactly that, recounting Ms. Clapham's highly restrictive opinions regarding Thiele's physical functional limitations and finding them inconsistent with the objective evidence of record showing a conservative treatment history and improvement in his COPD. (Tr. 20.)

Thiele next argues the ALJ's reasons for rejecting Ms. Clapham's opinions are not supported by substantial evidence. This argument is rejected. With regard to Thiele's degenerative disc disease, the record indicates Thiele was treated conservatively with a knee brace and orthotics, some physical therapy, and pain medication. As set forth at length in the ALJ decision, treatment notes indicate Thiele principally complained of knee, low back, and neck pain. In May 2012, x-rays of Thiele's knees were normal; Thiele reported improvement in his knee pain with the use of a brace and orthotics; and it was noted he was able to do physical therapy exercises without complaint. (Tr. 255, 345-347.) Moreover, although three additional physical therapy sessions were scheduled, it does not appear Thiele attended them.

With regard to his lower back, x-rays of Thiele's lumbar spine showed degenerative disc disease and "slight scoliosis." (Tr. 513.) Ms. Clapham's treatment notes, however, consistently noted steady gait and lower extremity muscle strength of either 4/5 or 5/5. (Tr. 597, 619, 652.) Thiele was generally prescribed Tylenol or Ibuprofen 800 mg. There is no evidence of injections, lumbar blocks, or additional physical therapy. Nor is there any

indication Thiele was referred for an orthopedic or surgical consultation regarding this condition.  Finally, with regard to his neck pain, Thiele first complained of neck pain in March 2014.  Contemporaneous x-rays of his cervical spine showed "moderately severe narrowing at C6-C7."  (Tr. 659-660.)  The only treatment for this condition appears to have been a prescription for Ibuprofen 800 mg and the recommendation that Thiele participate in physical therapy if the pain medication was not effective.  (Tr. 570.)  There is no indication Thiele sought any additional treatment for his neck pain subsequent to his March 2014 treatment visit.

In light of the above, the Court finds substantial evidence supports the ALJ's conclusion that Thiele was treated conservatively for his degenerative disc disease.  The Court also concludes it was not unreasonable for the ALJ to further determine that Ms. Clapham's rather extreme lifting, carrying, standing, walking, sitting, and postural limitations were inconsistent with Thiele's treatment history and the medical evidence noted above.

As for Thiele's COPD, the ALJ discussed the medical evidence regarding this condition at length earlier in the decision.  (Tr. 19-20.)  The ALJ acknowledged that, in 2011, Thiele experienced wheezing, coughing, and shortness of breath, and pulmonary function testing indicated moderate obstruction.  However, the ALJ went on to cite medical evidence showing significant improvement in this condition after Thiele retired from his concrete mixer truck job in December 2012.  In particular, the ALJ noted as follows:

> In December 2012, he reported to his doctor that he retired.  He reported that since he was no longer working around chemicals, he felt better and his COPD was improved.  He admitted he had not refilled his Symbicort prescription since April 2012, because he had not needed it (Exhibit 5F/20).  He reported he was no longer using his albuterol daily (Exhibit 5F/21).  A chest x-ray indicated stage 2 COPD.  His doctor noted that the claimant's COPD had improved since he stopped working around chemicals at a heavy exertional level (Exhibit 5F/26).

> The treatment for the claimant's COPD in 2013 and 2014 was minimal, and
> consisted mostly of medication refills.  He did not have any acute
> exacerbations, and did not require any steroids.  In January 2014, the
> claimant's doctor noted he was doing well from a pulmonary perspective.
> The claimant reported he did not even need to use his medications daily, and
> was averaging albuterol 3-4 times a week.  He did report some snoring at
> night, but declined any testing for his (Exhibit 7F/20).  The claimant reported
> he was feeling slightly short of breath with colder temperatures, so his doctor
> encouraged him to use his Spiriva daily (Exhibit 7F/21). These medications
> were again refilled in July 2014 (Exhibit 7F/2).

(Tr. 19-20.)

The Court finds substantial evidence supports the ALJ's conclusion that Thiele

enjoyed significant improvement in his COPD after treatment and retiring from his job.  (Tr.

631-637, 582-583.)  Morever, in light of this improvement, the Court concludes it was

reasonable for the ALJ to reject Ms. Clapham's conclusion that Thiele's COPD necessitated the

extreme limitations set forth in her June 2013 opinion.  (Tr. 561-562.)

Accordingly, and for all the reasons set forth above, Thiele's argument that the RFC is

not supported by substantial evidence because the ALJ improperly rejected Ms. Clapham's

opinion, is without merit.

### State Agency Physicians Drs. Villanueva and Pylaeva

Thiele next argues, summarily, that the ALJ erred in according "great weight" to the

opinions of Drs. Villanueva and Pylaeva, which were issued in November 2012 and March

2013 respectively.  The ALJ discussed these opinions, as follows:

> Esberdado Villanueva, M.D., a consultant with the State Disability
> Determination Services opined that the claimant could perform a range of
> medium work.  The doctor further found that the claimant could frequently
> climb ramps and stairs, never climb ladders, ropes, or scaffolds, and
> frequently balance, stoop, kneel, crouch, and crawl.  Dr. Villanueva opined
> that the claimant could hear normal conversations, but would have difficulty
> in noisy situations, and would need to avoid concentrated exposure to extreme

38

cold, extreme heat, noise, fumes, odors, dusts, gases, poor ventilation, and hazards.  (Exhibit 1A).  Olga Pylaeva, M.D., another consultant, affirmed this opinion.  (Exhibit 3A).  **I afford these opinions great weight.  They are consistent with the claimant's x-rays, his minimal treatment course, his activities of daily living, and take into consideration his trouble working around fumes and in noisy environments.**

(Tr. 20-21) (emphasis added).

The Court finds the ALJ did not err in affording "great weight" to the above opinions. While Thiele argues the x-rays of his lumbar spine support a restriction to sedentary work, Dr. Villanueva reviewed the May 2012 x-rays, and Dr. Pylaeva reviewed both the May and December 2012 x-rays.  Both physicians interpreted the results as "benign" and found Thiele could perform a reduced range of medium work.  (Tr. 73, 88.)  Thiele does not direct this Court's attention to any treating physician opinion that supports greater physical functional limitations stemming from his degenerative disc disease.  Moreover, as discussed above, the medical record indicates conservative treatment and consistent findings of steady gait and full (or near full) muscle strength in Thiele's bilateral lower extremities.

With regard to Thiele's COPD, it was not unreasonable for the ALJ to afford great weight to the state agency physicians' determination that Thiele should avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and poor ventilation.  (Tr. 74, 89.)  The ALJ accommodated these limitations in the RFC by restricting Thiele to frequent exposure to extreme heat and cold, and occasional exposure to pulmonary irritants such as fumes, dusts, gases, odors, and poor ventilation.  (Tr. 16.)  As noted above, substantial evidence supports the ALJ's conclusion that Thiele's COPD significantly improved with treatment and his retirement from his job as a concrete mixer truck driver.  (Tr. 631-637, 582-583.)  Moreover, once again, Thiele does not direct this Court's attention to any treating physician opinion that

39

supports greater limitations stemming from his COPD.

Accordingly, the Court finds the ALJ did not err in affording "great weight" to the opinions of state agency physicians Drs. Villanueva and Pylaeva.

### *Pulmonary Impairment*

Finally, Thiele argues the ALJ "misinterprets or fails to fully consider [his] pulmonary impairment in his conclusions regarding his residual functional capacity." (Doc. No. 19 at 11.) He argues the medical evidence supports "more significant limitations than those found by the ALJ and the consistent performance of the physical requirements for medium work." (*Id*. at 12.)

The Court rejects this argument. As has been discussed at length above, the ALJ recognized that Thiele's COPD constituted a severe impairment and thoroughly discussed the medical evidence regarding this condition at step four. Consistent with the opinions of Drs. Villanueva and Pylaeva, the ALJ acknowledged Thiele's COPD resulted in functional limitations and accommodated those limitations by restricting him to frequent exposure to extreme heat and cold, and occasional exposure to pulmonary irritants such as fumes, dusts, gases, odors, and poor ventilation. (Tr. 16.) Thiele points to no treating physician opinion supporting greater functional limitations relating to his COPD. The ALJ's RFC fully accounts for this condition and is supported by substantial evidence. Thiele's argument to the contrary is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.


    _s/Jonathan D. Greenberg_____
    Jonathan D. Greenberg
    United States Magistrate Judge

Date: March 10, 2017

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**